FILED

bons

SEP 1 0 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>INTERNATIONAL MANUFACTURING GROUP, INC.,<br><br>Debtor.<br>_____ | Case No. 14-25820-D-11 |
| BEVERLY N. McFARLAND,<br>Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC CAPITAL CORPORATION,<br><br>Defendant.<br>_____ | Adv. Pro. No. 15-2130-D<br><br>Docket Control No. JRD-1<br><br>DATE:  September 9, 2015<br>TIME:  10:00 a.m.<br>DEPT:  D |

### MEMORANDUM DECISION

This is the motion of defendant General Electric Capital Corporation ("GECC") to dismiss the complaint of the plaintiff, Beverly McFarland, who is also the trustee in the chapter 11 case in which this adversary proceeding is pending (the "trustee"), pursuant to Fed. R. Civ. P. 9(b) and 12(b)(1), made applicable in this proceeding by Fed. R. Bankr. P. 7009 and 7012(b), for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. The plaintiff has filed opposition, GECC has filed a reply, and the court has heard oral argument. For the following reasons, the motion will be denied.

/ / /

In ruling on a Rule 12(b)(6) motion, a court "accept[s] as true all facts alleged in the complaint, and draw[s] all reasonable inferences in favor of the plaintiff."  al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009), citing Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).  The court assesses whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  al-Kidd, 580 F.3d at 949, citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, (2009), in turn quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

By her complaint, the trustee seeks to avoid four transfers of $500,000 each made by an entity named Olivehurst Glove Manufacturers, LLC ("Olivehurst") to GECC as actual fraudulent conveyances, pursuant to § 548(a)(1)(A) of the Bankruptcy Code,[1] and to recover the value of the transfers from GECC, pursuant to § 550.  The transfers were made within the year prior to the filing of the chapter 11 petition of International Manufacturing Group, Inc. ("IMG"), the debtor in the case in which this adversary proceeding is pending.  Olivehurst has been substantively consolidated into IMG's bankruptcy estate.  GECC makes five arguments in support of its contention that the complaint fails to state a claim upon which relief can be

/ / /

/ / /

---

1.  Unless otherwise indicated, all statutory references are to the United States Bankruptcy Code, Title 11, United States Code.

1 granted.   The court will take them in the order presented by

2 GECC.[2]

3 ## I.   The Fraudulent Transfer Versus Preference Issue

4     First, GECC contends the trustee's claim is a preference

5 claim, not a fraudulent transfer claim, and that, as a preference

6 claim, it is time-barred because all of the transfers were made

7 more than 90 days before the date IMG filed its petition, May 30,

8 2014.   There is no dispute that the transfers were made outside

9 the 90-day period, and therefore cannot be recovered as

10 preferences.   The question is whether, even if they could have

11 been recovered as preferences if they had been made within the 90

12 days, they might be fraudulent transfers as well.   GECC cites

13 Boston Trading Group, Inc. v. Burnazos, 835 F.2d 1504 (1st Cir.

14 1987), for the proposition that "fraudulent transfer laws cannot

15 be used to recover payments to legitimate lenders where the

16 transferee engaged in fraud to raise the money used to repay the

17 lender."   GECC's Motion, filed July 24, 2015 ("Mot."), at

18 10:15-17.

19     In Boston Trading, a court-appointed receiver for a company

20 that managed the funds of commodities investors sought to recover

21 as actual fraudulent conveyances payments made by the company's

22 owners, Shaw and Kepreos, from the company's funds, to the

23 individual who had sold them the company, Burnazos, toward the

24 purchase price.   The evidence showed that Shaw and Kepreos had

25 been churning investors' accounts by making unnecessary trades in

26

27     2.   GECC's contention that the complaint fails to state
28 fraud with particularity is woven throughout the motion, not
   separately treated; the court addresses it in like fashion.

1  order to generate commissions; the receiver alleged Burnazos knew

2  or should have known about their dishonest activity.

3       The court held that where an individual uses his

4  corporation's money, which he obtained dishonestly, to pay his

5  debt to a creditor "who knows of, but did not participate in,

6  [the] dishonesty," the payment is not recoverable as an actual

7  fraudulent conveyance.  835 F.2d at 1510.  The court's discussion

8  and holding both strongly suggest the court believed that a

9  preference, which the payments to Burnazos clearly were, cannot

10 also be a fraudulent transfer.  The court made this blanket

11 statement:  "The cases and the commentators . . . state that

12 fraudulent conveyance law does not seek to void transfers in a .

13 . . circumstance known as a 'preference.'"  Id.  In explanation,

14 the court stated that the purpose of the fraudulent transfer laws

15 is not to achieve an equal distribution among creditors (id. at

16 1508-09), but "to see that the debtor uses his limited assets to

17 satisfy some of his creditors . . . ."  Id. at 1509.  The court

18 added that "to find an actual intent to defraud creditors when .

19 . . an insolvent debtor prefers a less worthy creditor, would

20 tend to deflect fraudulent conveyance law from one of its basic

21 functions (to see that an insolvent debtor's limited funds are

22 used to pay some worthy creditor), while providing it with a new

23 function (determining which creditor is the more worthy)."  Id.

24      In short, the Boston Trading court came very close to

25 holding, if it did not actually do so, that a transfer that would

26 constitute a preference if made within the preference period

27 cannot also be an actual fraudulent conveyance.  However, the

28 court did not also find that a preference cannot be a

- 4 -

constructive fraudulent conveyance.  Instead, it remanded for a
retrial on the issue of whether Burnazos gave a "fair equivalent"
in exchange for the payments.  835 F.2d at 1513-14.  The court
did hold, as to the "good faith" defense to a constructive
fraudulent transfer claim, that lack of good faith cannot be
found from the mere fact that the creditor received a preference,
even where the creditor knew the payment was made with improperly
obtained funds.  Id. at 1511-12.

> Whatever "good faith" may mean . . . we believe it does
> not ordinarily refer to the transferee's knowledge of
> the source of the debtor's monies which the debtor
> obtained at the expense of other creditors.  To find a
> lack of "good faith" where the transferee does not
> participate in, but only knows that the debtor created
> the other debt through some form of, dishonesty is to
> void the transaction because it amounts to a kind of
> 'preference' - concededly a most undesirable kind of
> preference, one in which the claims of alternative
> creditors differ considerably in their moral worth, but
> a kind of preference nonetheless.  And all the reasons
> that militate against finding a § 7 violation ('actual
> fraud') in such circumstances . . . militate with at
> least equal force against finding a § 4 violation
> ('constructive fraud').

Id. at 1512 (citations omitted).[3]

GECC's reliance on Boston Trading is not persuasive in this
case for several reasons.  First, as the trustee points out, the
case involved only state fraudulent transfer law (in particular,
the law of Massachusetts); the cases the court cited in support
of its conclusion that a preference cannot also be an actual
fraudulent conveyance involved only state law, not § 548 of the
Bankruptcy Code.  GECC's only response on this point is to note
that "Section 548 is based on the Uniform Fraudulent Conveyance

---

3.  As discussed below, this analysis of the good faith
standard appears to be contrary to Ninth Circuit law.

Act" (GECC's Reply, filed Sept. 2, 2015 ("Reply"), at 4:25), on which the state fraudulent transfer laws are also based.  The answer is too pat.  Although the state and federal statutes are "similar in form and substance" (In re United Energy Corp., 944 F.2d 589, 594 (9th Cir. 1991)), they are not identical.  See Plotkin v. Pomona Valley Imports (In re Cohen), 199 B.R. 709, 712 (9th Cir. BAP 1996) ["The differences between the fraudulent transfer provisions in the Bankruptcy Code and the Uniform Fraudulent Transfer Act are central to this appeal."]; see also Jobin v. McKay (In re M & L Bus. Mach. Co.), 84 F.3d 1330, 1338 (10th Cir. 1996) ["[W]e are not persuaded . . . that the definitions of good faith under . . . state fraudulent conveyance laws should be adopted in interpreting § 548(c).  Many of these provisions contain language different than the language used in § 548(c) and . . . involve policy concerns not applicable here."].

Second, as the trustee points out, the statutory language itself strongly suggests that a transfer may be avoidable as both a preference and a fraudulent transfer under federal bankruptcy law.  The Bankruptcy Code provides:  "Except to the extent that a transfer . . . voidable under this section is voidable under section . . . 547 of this title," a transferee that takes for value and in good faith may retain the property transferred. § 548(c) (emphasis added).  Were preferences and fraudulent transfers mutually exclusive, this language would be meaningless.

Third, as the trustee also points out, if preferences and fraudulent transfers were mutually exclusive, trustees in Ponzi scheme cases would be unable to recover payments made to earlier investors at the expense of later ones except those made in the

90-day preference period.  Yet "[c]ourts have routinely applied [state fraudulent transfer law] to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi scheme investors.  The Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.'  The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer." Donell v. Kowell, 533 F.3d 762, 767 (9th Cir. 2008) (citations omitted).  "The policy justification is ratable distribution of remaining assets among all the defrauded investors." Id. at 770.[4]  As the trustee puts it, "[i]f creditor status were enough to immunize a transfer from section 548 avoidance by magically transforming it into a preference, then a trustee could never avoid transfers made as return of principal under section 548" (Trustee's Opposition, filed Aug. 26, 2015, at 16:20-17:1), which trustees can do in cases of actual fraudulent transfers to transferees not acting in good faith. Id. at 771 ["Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, including amounts which could be considered 'return of principal.'  However, there is a 'good faith' defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay."].

Fourth, a close analysis of Boston Trading reveals that it does not stand for the proposition for which GECC cites it.  As stated in its reply, GECC cites the case as "establish[ing] that fraudulent transfer claims do not lie against legitimate

---

4.  This latter statement blunts GECC's insistence on the differing purposes behind preference and fraudulent conveyance law as decisive.

creditors receiving payment on legitimate debt, even where the
transferee may have had reason to suspect the source of the funds
and knew that the transferor was a fraudster."  Reply at 3:16-18.
Where GECC goes wrong is in focusing on the status, knowledge,
and behavior of the <u>transferee</u> - as, for example, a "legitimate
creditor receiving payment on legitimate debt" and the
<u>transferee's</u> knowledge "that the transferor was a fraudster,"
whereas for purposes of an actual fraudulent conveyance, the
initial focus is on the <u>transferor</u> and only the transferor.  That
is, the first question the court must decide is whether the
<u>transferor</u> made the transfer "with actual intent to hinder,
delay, or defraud" his or her creditors.  § 548(a)(1)(A).  There
is nothing in the statute to suggest that a payment on a
legitimate debt to a legitimate creditor cannot be an actual
fraudulent conveyance if it was made with the actual intent on
the part of the transferor to hinder, delay, or defraud his or
her creditors.

This is where GECC departs from the actual holding in <u>Boston</u>
<u>Trading</u>; that is, the holding as applied to the facts in the
case, as opposed to the court's general conclusions about
fraudulent transfers and preferences.  The court acknowledged
that the Massachusetts statute it was considering "makes
'fraudulent' every transfer made 'with actual intent' (as opposed
to 'intent presumed in law') to 'hinder, delay or defraud . . .
creditors.'"  <u>Boston Trading</u>, 835 F.2d at 1510.  The court then
held, with regard to the specific facts in the case:

In effect, the Receiver argues that Shaw and Kepreos took the $ 473,000 from BTG by fraud (or other dishonest means) and paid it to Burnazos who had full knowledge of their dishonesty.

We rephrase the legal question slightly both to reflect the evidence and to avoid the potentially confusing coincidence that we are dealing with a form of initial dishonesty (i.e., the 'churning' of accounts by Shaw and Kepreos) that itself happens to be called fraud. Suppose that S & K, officers of Corporation C, obtain C's money through dishonest means (larceny, fraud, etc.) and use it to pay a debt that S & K owe B, a transferee who knows of, but did not participate in, S & K's dishonesty. Does [the Massachusetts actual fraudulent transfer statute] permit C to recover its money from B? We think the district court correctly ruled that [it] does not.

First, we have found no modern case . . . that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns <u>not S & K's transfer to B</u>, but the <u>manner in which the original debt to C arose</u>. Fraudulent conveyance law is basically concerned with <u>transfers</u> that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created.

<u>Id.</u> (first emphasis added). In other words, the court found no

actual intent to defraud in the transfer the receiver was

challenging, only in the manner in which the transferors had

acquired the money in the first place.

The court later referred to the facts before it, "where the

only fraud concerns the <u>source</u> of the funds transferred" (<u>id.</u> at

1513 (emphasis in original)), and concluded that "the only

'fraud' shown in respect to Shaw and Kepreos concerns the <u>source</u>

of the debt to NIS, not the <u>transfer</u> to Burnazos. That kind of

fraud – dishonesty in the <u>creation</u> of the debt – is (in the

circumstances present here) not the kind of fraud that the

[Massachusetts actual fraudulent transfer statute] addresses."

<u>Id.</u> at 1517 (emphasis in original). In other words, the only

- 9 -

fraud the court found was in the way the transferors had acquired
the money they transferred to the transferee; there was no
evidence the transferors made the transfer – the one challenged
by the receiver – with the actual intent to hinder, delay, or
defraud creditors.  The case simply does not support the
conclusion GECC draws from it – that regardless of the
transferor's intent in making the challenged transfers, "where,
as here, the transfers at issue are used to pay a legitimate
creditor a legitimate debt those transfers are not 'voidable' in
the first instance . . . ."  Reply at 3:13-15.

     GECC fares no better with the second case it cites, although
the facts appear at first glance more similar to those in this
case.  Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re
Sharp Int'l Corp.), 403 F.3d 43 (2nd Cir. 2005), involved a
debtor company that "was looted by its controlling shareholders."
403 F.3d at 46.  The bankruptcy trustee then sued, under New York
fraudulent transfer law, one of the debtor's lenders, State
Street Bank, "which suspected the fraud and extricated itself in
a way that, according to [the trustee], facilitated the
victimization of other lenders and the continued looting of [the
debtor] itself."  Id.  The bankruptcy court dismissed the
trustee's complaint on a Rule 12(b)(6) motion; the district court
affirmed, holding, with respect to the trustee's actual
fraudulent transfer claims, that the trustee, although he had
alleged actual knowledge of the fraud on the part of State
Street, "had not alleged that State Street 'participated in' or
'induced' the [controlling shareholders'] fraud."  Id. at 49.
/ / /

- 10 -

The factual allegations in <u>Sharp Int'l</u> are similar to those in the present case.  In that case, the controlling shareholders "falsified sales, inventory, and accounts receivable, and invented customers, in order to report fictitious revenue on [the company's] nonpublic financial records" (403 F.3d at 46), fraudulently reporting that its sales were much higher than they were, thus enabling the shareholders to borrow more and more money, which they then diverted to themselves.  After its loans were made, State Street began to suspect problems from the company's "refusal to comply with accounting procedures required under the [parties'] loan agreement," its "fast growth and voracious consumption of cash" (<u>id.</u> at 47), and State Street's responsible officer's experience with a fraud at another company.  State Street hired both outside counsel and a financial investigation firm to conduct a formal investigation.  It also asked for more information about the company's customers, asked to see its outside auditor's work papers, requested formal confirmation of accounts receivable, reviewed checks for insider payments, and reviewed Dun & Bradstreet reports on several of the company's customers.  When this information was either refused or turned up yet more suspicious circumstances, the trustee alleged, State Street "arranged quietly for [the shareholders] to repay the State Street loan from the proceeds of new loans from unsuspecting creditors . . . ."  <u>Id.</u>

The court of appeals found these allegations insufficient to support a claim against State Street for aiding and abetting breaches of fiduciary duty because they did not sufficiently allege that State Street knowingly induced or participated in the

- 11 -

fraud.   403 F.3d at 50.   Although it assumed for purposes of its decision that "State Street knew about the looting as well as about the use of phony books and records to obtain loans" (id.), the court found that "the complaint says no more than that State Street relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn."   Id. at 51.   As to the actual fraudulent conveyance claim, however, the focus was, as in Boston Trading, on the absence of fraud in the particular transfer the trustee sought to avoid.   The court held that the claim "fails for the . . . reason that [the trustee] inadequately alleges fraud with respect to the transaction that [he] seeks to void, i.e., [the debtor's] $ 12.25 million payment to State Street."   Sharp Int'l, 403 F.3d at 56, citing Boston Trading, 835 F.2d at 1510, for the proposition that "[f]raudulent conveyance law is basically concerned with transfers that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created."   "The fraud alleged in the complaint relates to the manner in which [the debtor] obtained new funding from the Noteholders, not [the debtor's] subsequent payment of part of the proceeds to State Street."   Sharp Int'l, 403 F.3d at 56.

In contrast, in the present case, the complaint contains detailed allegations that, taken as true, would support a finding that the transfers to GECC were made with the actual intent on the part of the transferor to hinder, delay, or defraud

- 12 -

creditors.[5]  The complaint alleges, first, that each of the
transfers was made in furtherance of the Ponzi scheme in that, by
causing the transfers to be made, its mastermind, Deepal
Wannakuwatte, "hoped to appease GECC, thereby prolonging the
duration of the fraudulent scheme by:  (a) avoiding any adverse
final judgment or findings of fact in litigation; (b) preventing
knowledge of his various fraudulent schemes—and by extension, the
'wholesale' division fraud—from becoming more widespread; and/or
(c) otherwise enabling IMG to remain in operation and the fraud
to continue."  Trustee's Complaint, filed June 16, 2015
("Compl."), at 15:15-19.  The complaint goes on:

> at the time each of the Settlement Transfers was made,
> Deepal Wannakuwatte understood that causing those
> transfers to be made would inevitably harm IMG's and
> Olivehurst's creditors.  Wannakuwatte knew that he had
> operated a Ponzi scheme, that he had repeatedly
> defrauded investors into providing financing for IMG's
> functionally non-existent "wholesale" division, and
> that IMG's investors would not be repaid when his
> scheme ended.  Wannakuwatte further knew that
> Olivehurst, IMG, and Relyaid were hopelessly insolvent.
> Deepal Wannakuwatte knew that causing the Settlement
> Transfers would harm investors by both:  (a) prolonging
> the scheme and (b) reducing the amount of funds
> available to repay creditors.  Finally, Wannakuwatte
> knew that using funds to pay off GECC, rather than
> invest in product, constituted a fraud upon the
> investors whom had provided funds to Olivehurst.

Id. at 16:1-3.  The complaint also alleges sufficient ownership
and control by Wannakuwatte over Relyaid, IMG, and Olivehurst to
impute his intent to them.

---

     5.  It is important to note that the verbs, as used in §
548(a)(1)(A), are in the disjunctive; thus, the trustee need
establish only one of the three with respect to the payments to
GECC – that they were made with the actual intent to hinder
creditors, the actual intent to delay creditors, or the actual
intent to defraud creditors.  In re Stanton, 457 B.R. 80, 93-94
(Bankr. D. Nev. 2011); In re Roca, 404 B.R. 531, 543-44 (Bankr.
D. Ariz. 2009).

1  These allegations are more than sufficient to state a claim

2  under §§ 548 and 550 upon which relief can be granted.   To be

3  clear, there was no indication in either the Boston Trading or

4  the Sharp Int'l decision that the plaintiff's complaint contained

5  such allegations.   For the reasons stated, the court rejects

6  GECC's contention that the trustee's claim is nothing more than a

7  time-barred preference claim.

8  ## II.   The Question of Duty

9  Next, GECC contends the complaint cannot stand because "the

10 Trustee can never plead facts which would create the duty upon

11 which her fraudulent transfer claim is premised."  Mot. at 4:6-7.

12 The problem with the argument is simple:  duty is not an element

13 of a fraudulent conveyance claim.   Thus, there is no requirement

14 that the plaintiff plead or prove the transferee had any sort of

15 duty.

16 GECC frames the issue in terms of law other than the law of

17 fraudulent conveyances:

18     GE Capital did not owe a duty to its borrower and
       guarantors beyond any duties expressed in the
19     underlying Equipment Loan Agreement. . . .  A lender's
       decision to exercise rights granted by contract cannot
20     form the basis of a fraudulent transfer claim because
       no duty to a guarantor or other creditors is breached
21     under these circumstances.  The Trustee does not and
       cannot allege that anything in the Equipment Loan
22     Agreement created a duty to IMG or its creditors
       requiring GE Capital to disclose anything to anyone
23     about its efforts to collect on the loan.  Furthermore,
       even assuming a failure to disclose material facts
24     known only to one party, no cause of action lies unless
       there is a fiduciary duty or confidential relationship
25     imposing a duty to disclose.  The Trustee does not
       allege any duty or confidential relationship which
26     required GE Capital to disclose anything to IMG's
       creditors.

27

28 Mot. at 13:3-5; 13:19-14:5 (citations omitted).  The authority

- 14 -

1  GECC cites for these propositions, <u>Sipe v. Countrywide Bank</u>, 690

2  F. Supp. 2d 1141, 1153 (E.D. Cal. 2010), and Cal. Civ. Code

3  1710(3), has nothing to do with fraudulent conveyance law.[6]

4      In its reply, GECC seems to back away from its theory that a

5  breach of duty is an element the trustee must plead and instead

6  frame the duty issue more in terms of whether GECC acted in good

7  faith when it took the payments.  The court will return to this

8  aspect of the discussion below.

9                    **III.  The Ponzi Scheme Presumption**

10     Next, GECC claims the trustee's complaint fails because it

11  does not "includ[e] specific facts supporting a reasonable

12  inference that the challenged transfers are connected to a Ponzi

13  scheme" (Mot. at 14:4-5), and therefore, the Ponzi scheme

14  presumption of actual fraud does not apply.  GECC relies heavily

15  on the fact that it is not alleged to have been an investor in

16  the Ponzi scheme.  First, the court has already concluded that

17  the trustee's complaint sufficiently alleges actual fraud on the

18  part of the transferor to state a claim; thus, application of the

19  Ponzi scheme presumption is not necessary.

20     However, the court will also deny the motion on the

21  independent basis that the allegations of the complaint are

22  sufficient to state a claim based on the Ponzi scheme

23  presumption.  The trustee has cited a number of cases supporting

24  the proposition that, depending on the connections between the

25  Ponzi scheme and the payments to the lenders, the presumption may

26  _____

27     6.  GECC also cites <u>Sharp Int'l</u>, 403 F.3d at 52, n.2, which,
    as discussed above, was a fraudulent conveyance case; however,
28  GECC's citation is to a section of the opinion concerning a claim
    for aiding and abetting the breach of a fiduciary duty.

1  be applied against commercial lenders who were not investors in

2  the Ponzi scheme.  GECC, on the other hand, cites <u>Klein v. Bd. of</u>

3  <u>Trs. of the Cal. State Univ. (In re Moriarty)</u>, 2014 Bankr. LEXIS

4  4802 (Bankr. C.D. Cal. 2014).  In that case, a couple named

5  Moriarty made a donation to Cal Poly which Cal Poly agreed to and

6  did use to purchase a new video scoreboard for its stadium and to

7  put the name of the couple's business at the top of the

8  scoreboard.  When the couple later filed bankruptcy, the trustee

9  in their case sued to avoid the transfer under § 544 of the

10 Bankruptcy Code and California fraudulent transfer law.  The

11 court granted Cal Poly's Rule 12(b)(6) motion – with leave to

12 amend – because the

13       complaint does not contain facts describing the
         Moriarty Ponzi Scheme nor does it contain specific
14       facts to support a reasonable inference that the
         subject transfers were connected to the Moriarty Ponzi
15       Scheme.  Furthermore, Klein's complaint does not allege
         sufficient facts to form the basis for a finding that
16       the subject transfers actually hindered, delayed or
         defrauded a creditor of the Debtor or that the Debtor
17       intended the subject transfers to do so on the date of
         the transfer.
18

19 2014 Bankr. LEXIS 4802, at *27.

20      The case does not support GECC's position here because,

21 unlike the trustee in <u>Moriarty</u>, the trustee has alleged

22 sufficient connections between the Ponzi scheme and the payments

23 to GECC to state a claim to relief based on the Ponzi scheme

24 presumption.  First, she has made detailed allegations concerning

25 the Ponzi scheme itself.  She has also alleged IMG routinely used

26 the name of consolidated debtor Relyaid (GECC's borrower) in its

27 marketing materials to potential investors in the scheme; that

28 Wannakuwatte pled guilty and was convicted for his role in the

- 16 -

scheme; that a large portion of the loan proceeds from GECC were deposited into "the primary bank account through which Ponzi scheme payments to investors were made" (Compl. at 11:16); that other proceeds went to Wannakuwatte, his spouse, IMG, and another consolidated entity; that the funds used to make the payments to GECC came from IMG investors; and that, based on the facts alleged above, the payments were made in furtherance of the Ponzi scheme.

## IV.    GECC as a Net Loser

GECC next argues that "[t]he Trustee cannot have it both ways." Mot. at 16:13. "She relies on the Ponzi scheme presumption while refusing to recognize that the net winner rule applies. Were the Ponzi scheme presumption applicable, and the transfers at issue were part of the underlying scheme, thus giving rise to the presumption, that presumption operates only against 'net winners.'" Mot. at 16:13-16. (It is undisputed that the payments made to GECC totaled less than the amount GECC loaned Relyaid.)

This argument improperly conflates the Ponzi scheme presumption and the "net winner rule."[7] The Ponzi scheme

---

7.    The presumption is simply stated: "[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." <u>Donell</u>, 533 F.3d at 770 (citations omitted, internal quotation marks omitted). The net winner "rule," more accurately called the "netting rule," is simple as well:

Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good

- 17 -

presumption comes into play only with respect to the transferor's intent in making the challenged transfers; that is, it is relevant solely to the trustee's case-in-chief for avoidance of an actual fraudulent conveyance.  The "net winner rule," in contrast, concerns only the issue whether the recipient of the transfer gave reasonably equivalent value to the transferor in exchange for the transfer.  Thus, it comes into play solely in connection with (1) the trustee's case-in-chief for avoidance of a constructive fraudulent conveyance under § 548(a)(1)(B) and/or the related state law provision, and (2) the "for value" portion of the transferee's "good faith and for value" defense under § 548(c) and/or related state law provisions.  The "net winner" rule is really nothing more than the recognition that a Ponzi scheme investor has a restitution claim against the debtor for the amounts the investor paid into the scheme, the satisfaction of which constitutes reasonably equivalent value for the payments the investor received back before the scheme collapsed.  This brings the court to GECC's final argument.

### V.   The Issue of Good Faith

GECC's final argument is that "[a]ssuming the Trustee adequately pled a fraudulent transfer claim, the complaint must be dismissed as GE Capital is a good faith creditor which took for value."  Mot. at 18:17-18.  The problem here is that GECC's

        faith.  If the net is negative, the good faith investor
        is not liable because payments received in amounts less
        than the initial investment, being payments against the
        good faith losing investor's as-yet unsatisfied
        restitution claim against the Ponzi scheme perpetrator,
        are not avoidable within the meaning of UFTA.

Id. at 771.

good faith is a component of its good faith and for value

defense, which, in the context of an actual fraudulent

conveyance, is an affirmative defense.  "It is not incumbent on

the plaintiffs to plead lack of good faith on defendants' part

because lack of good faith is not an element of a plaintiff's

claim under Section 548(a)(1)[(A)]."  <u>Bayou Superfund, LLC v. WAM</u>

<u>Long/Short Fund II, L.P. (In re Bayou Grp., LLC)</u>, 362 B.R. 624,

639 (Bankr. S.D.N.Y. 2007); <u>see also</u> <u>Brandt v. KLC Fin., Inc. (In</u>

<u>re Equip. Acquisition Res., Inc.)</u>, 481 B.R. 422, 429 (Bankr. N.D.

Ill. 2012); <u>Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.</u>

<u>LLC)</u>, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010).

Whether GECC acted in good faith is a question of fact that

would ordinarily not be appropriately resolved on a motion to

dismiss.  "The element of good faith under section 548(c) of the

Code, bearing upon a transferee's motivations, is indisputably a

factual question that may not be determined on the face of [a]

complaint."  <u>In re Bernard L. Madoff Inv. Sec.</u>, 440 B.R. at 256.

However, GECC contends that "based on the allegations in the

Complaint viewed in the light most favorable to the Trustee, GE

Capital satisfies its burden to establish good faith under

section 548(c)."  Mot. at 19:16-18.

"Dismissal under Rule 12(b)(6) on the basis of an

affirmative defense is proper only if the defendant shows some

obvious bar to securing relief on the face of the complaint."

<u>Asarco, LLC v. Union Pac. R.R. Co.</u>, 765 F.3d 999, 1004 (9th Cir.

2014) (citations omitted).  On the other hand, "[i]f, from the

allegations of the complaint as well as any judicially noticeable

materials, an asserted defense raises disputed issues of fact,

- 19 -

1   dismissal under Rule 12(b)(6) is improper."  Id. (citation
2   omitted).  In GECC's view, the complaint fails because it does
3   not allege GECC knew of the Ponzi scheme and because the "red
4   flags" alleged in the complaint "do not come close to suggesting
5   knowing or reckless participation" in the Ponzi scheme.  Mot. at
6   19:19-20.  The argument fails for two reasons.  First, as
7   discussed below, "knowing or reckless participation" in the Ponzi
8   scheme is not the appropriate standard for the good faith test in
9   this circuit.  GECC's reliance in its motion on Sharp Int'l and
10  in its reply on B.E.L.T., Inc. v. Wachovia Corp., 403 F.3d 474
11  (7th Cir. 2005), is misplaced.  Both cases were decided under
12  state fraudulent transfer laws (New York and Illinois,
13  respectively), and both applied a standard for assessing good
14  faith that is not the standard in the Ninth Circuit under §
15  548(c).  Second, the court is not inclined to determine the
16  factual issues attendant to a good faith defense on a Rule
17  12(b)(6) motion.

18      "[G]ood faith is not susceptible of precise definition" (In
19  re Agricultural Research & Tech. Group, Inc., 916 F.2d 528, 536
20  (9th Cir. 1990) ("Agretech") (citation omitted, internal
21  quotation marks omitted)), and the analysis, being intensely
22  factual, must be made on a case-by-case basis.  Meeks v. Red
23  River Entm't (In re Armstrong), 285 F.3d 1092, 1096 (8th Cir.
24  2002).  Nevertheless, the courts have provided guidance.  Thus,
25  "courts look to what the transferee objectively 'knew or should
26  have known' in questions of good faith, rather than examining
27  what the transferee actually knew from a subjective standpoint."
28  Agretech, 916 F.2d at 535-56.  Facts that should have put a

reasonable person on notice of a fraudulent scheme, which would have been discovered through a diligent inquiry, constitute bad faith in receiving fraudulent transfers.  Id. at 539; see also Woods & Erickson, LLP v. Leonard (In re AVI, Inc.), 389 B.R. 721, 736 (9th Cir. BAP 2008) [looking to what the transferee objectively "knew or should have known," not what he knew from a subjective standpoint]; Plotkin, 199 B.R. 709 at 720 ["Facts sufficient to warrant a finding of inquiry notice are . . . sufficient to defeat the good faith that is essential to the § 548(c) safe harbor."].[8]

GECC's framing of the issue in its reply crystallizes the distinction between its view of the applicable good faith standard and the one just described, which applies in the Ninth Circuit.  In GECC's view, "'bad faith' is encouraging, aiding, abetting, or concealing a further fraud, embezzlement or Ponzi scheme . . . ."  Reply at 2:27.  As just discussed, the standard in this circuit for a transferee's good faith defense is not limited to someone who "encouraged, aided, abetted, or concealed" a fraud.

/ / /

---

8.  Other circuits apply the same or a similar standard. Thus, "[a] transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency."  Goldman v. Capital City Mortg. Corp. (In re Nieves), 648 F.3d 232, 238 (4th Cir. 2011) (citation omitted).  "[G]ood faith under § 548(c) should be measured objectively and . . . if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent."  Jobin, 84 F.3d at 1338 [10th Circuit].  "[T]he recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate."  Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890, 897-98 (7th Cir. 1988).

For the reasons stated, the court concludes the plaintiff's complaint contains factual allegations sufficient to state a claim to relief under § 548(a)(1)(A), and the motion will be denied.   The court will issue a minute order.

Dated: September 10, 2015        _Robert Bardwil_

ROBERT S. BARDWIL
United States Bankruptcy Judge

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court
generated document transmitted herewith to the parties below. The Clerk of
Court will send the Order via the BNC.

Christopher Daniel Sullivan
150 California Street, Ste. 2200
San Francisco CA 94111

Jonathan R. Doolittle
101 2nd St #1800
San Francisco CA 94105